**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>*ex rels.* John LaPlant and<br>Stephen Cardwell, and<br>**JOHN LAPLANT** and<br>**STEPHEN CARDWELL**, individually,<br><br>Plaintiffs,<br><br>v.<br><br>**SELMET, INC.,**<br><br>Defendant. | Docket No. ___6:20-cv-00965-MC___<br><br>**FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

### *QUI TAM* COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs and *qui tam* Relators John LaPlant and Stephen Cardwell, by and through their undersigned counsel, Brown, LLC and Crispin Marton Cambreleng, allege of personal knowledge as to their own observations and actions, and on information and belief as to all else, as follows:

## I.
## PRELIMINARY STATEMENT

1.    This is a *qui tam* action for fraud committed upon the United States by Defendant, by supplying parts that were poorly finished and improperly inspected, or sometimes not inspected at all, before being shipped to their customers for eventual installation in military aircraft, including at least the F-35 Joint Strike Fighter.

2.    Each Relator also brings an individual claim against Defendant under 31 U.S.C. § 3730(h) for retaliatory discharge.

3.    This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendant unless and until the Court so orders. A copy of the Complaint, along with written disclosure of substantially all material evidence and information

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

that Relator possesses, has been served contemporaneously herewith on the Attorney General of

the United States and the United States Attorney for the District of Oregon, pursuant to 31 U.S.C.

§ 3730(b)(2) and Fed. R. Civ. P. 4(d).

## II.
## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, because the complaint raises a federal question; and pursuant to 31 U.S.C. § 3732,

because the action is brought under 31 U.S.C. § 3730 and Defendant transacts business in and can

be found in this District.

5.      This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C.

§ 3732(a), because Defendant have at least "minimum contacts" with the United States, and can

be found in and/or transact business in this District.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and

31 U.S.C. § 3732(a) because at all times relevant to this Complaint, Defendant regularly conducted

substantial business within this District, maintained employees in this District, and/or made

significant sales within this District.

7.      The Complaint has been filed within the time period prescribed by 31 U.S.C.

§ 3731(b).

## III.
## NO PUBLIC DISCLOSURE;
## ORIGINAL SOURCE

8.      Relators make the allegations in this Complaint based on their own knowledge,

experience and observations.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

9.      Relators are the original source of the information on which the allegations herein are based, and have voluntarily disclosed such information to the United States before filing this action.

10.      There has been no public disclosure, relevant under 31 U.S.C. § 3730(e), of the allegations or transactions in this Complaint. Alternatively, to the extent that any such public disclosure has been made, Relators possess information that is independent of and materially adds to any allegations that may have been publicly disclosed.

### IV.
### THE PARTIES

**A.      Plaintiff the United States of America**

11.      Relators bring this action on behalf of Plaintiff **the United States of America** (also herein, "the Government"). At all times relevant to this action, the United States, acting through its agency the Department of Defense ("DOD"), was a party to numerous contracts under which various contractors and subcontractors, who in turn subcontracted with Defendant, would supply the Government with parts for military aircraft, including at least parts for the F-35 Joint Strike Fighter.

**B.      Relators**

12.      Relators **John LaPlant** and **Stephen Cardwell** are residents of Linn County, Oregon, which is within this judicial District.

13.      Relator LaPlant joined Selmet in approximately October 2017 as a Salvage Analyst. He was eventually promoted to Supervisor on the evening shift at Finishing West, the part of the Selmet plant where parts are given final inspections, testing, and finishing steps before shipping.

14.      LaPlant was terminated on or about July 31, 2019, in retaliation for his lawful efforts to stop the fraud at Selmet.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

15.      Relator Cardwell was a Visual/Dimensional Inspector on the evening shift at Selmet from approximately March, 2019 until approximately October, 2019. He had previously worked at Selmet as a Grinder from approximately 1999 until approximately 2001.

16.      Cardwell was constructively terminated on or about October 20, 2019, in retaliation for his lawful efforts to stop the fraud at Selmet.

**C.      Defendant**

17.      Defendant **Selmet, Inc.** ("Selmet") is a corporation formed and existing under the laws of the State of Oregon. Selmet's principal place of business is located in Linn County, Oregon, which is within this judicial District.

18.      According to its website, Selmet is "a worldwide leader in the manufacturing of titanium castings and machined parts for the aerospace industry" and "a state-of-the-art investment casting[1] foundry manufacturing parts for a variety of programs including the Boeing 737, Airbus A320, *and the F-35 Joint Strike Fighter*"[2] (emphasis added).

**V.**
**THE STATUTORY FRAMEWORK**

**A.      The False Claims Act**

19.      As pertinent here, the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), establishes liability for any entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

---

[1] Investment casting, also known as "lost-wax casting," involves the creation of a wax model of a desired metal part. A ceramic shell is then created ("invested") around the wax model. The wax model is then melted in a furnace, leaving a cavity mold into which molten metal can be poured to create the desired part. *See, e.g.,* https://marketing.metaltek.com/smart-blog/what_is_investment_casting_and_how_does_it_work (last accessed June 6, 2020). "Investment casting produces precision-engineered components while minimizing material waste, energy, and subsequent machining. No other casting method, perhaps other than die casting, can ensure production of very intricate parts." *Id.*

[2] https://www.selmetinc.com/about/ (last accessed June 6, 2020).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]

31 U.S.C. § 3729(a)(1).

20.    "Knowing" is defined in the FCA to include "deliberate ignorance of the truth" or "reckless disregard of the truth." *Id.* § 3729(b)(1).

21.    As relevant here, the FCA defines "claim" to include "any request for money that is made to a contractor, grantee, or other recipient, if the money … is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded; or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Id.* § 3729(b)(2)(A) (punctuation and paragraph formatting altered).

22.    The FCA provides for the assessment of treble damages for each false claim, plus a civil penalty.[3]

23.    The FCA also provides for payment of a percentage of the United States' recovery to a private individual who brings suit on behalf of the United States (a "relator") under the FCA. *See* 31 U.S.C. § 3730(d).

24.    The FCA also prohibits an employer from retaliating against an employee for reporting or attempting to stop violations of the FCA. *Id.* at § 3730(h)(1). Those who are subjected

---

[3] 31 U.S.C. § 3729(a)(1)(G) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. 2461 note, substituted a different statutory formula for calculating inflation adjustments on an annual basis. Following that formula, on January 29, 2018, the Department of Justice promulgated a Final Rule increasing the penalty for FCA violations occurring after November 2, 2015. For such penalties assessed after January 29, 2018, the minimum penalty is $11,181 and the maximum is $22,363. *See* 28 C.F.R. § 85.5; 83 Fed. Reg. 3945 (January 29, 2018).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

to such retaliation are entitled to reinstatement, two times backpay, interest, and special damages. *Id.* at § 3730(h)(2).

# VI.
## STATEMENT OF FACTS

### A.    The F-35 Joint Strike Fighter

25.    The F-35 "Lightning II" Joint Strike Fighter is a single-seat, single-engine fighter produced for and used by several branches of the U.S. military, and sold to the militaries of various countries around the world. Lockheed Martin is the prime contractor on the F-35 program.

26.    "With stealth technology, advanced sensors, weapons capacity and range, the F-35 is the most lethal, survivable and connected fighter aircraft ever built."[4] The F-35 is also one of the most, if not *the* most, expensive weapons system ever developed,[5] with each individual plane reportedly costing between $89.2 and $115.5 million, depending on the particular variant.[6]

27.    Pratt & Whitney is the Government's prime contractor for the engine used for the F-35.[7] Selmet is the major subcontractor for parts of the exhaust nozzle of the plane's engines.

28.    The nozzle, visible in Fig. 1, *infra*, consists of a number of partially overlapping flaps, in a design that is intended to reduce the infrared "signature" of the plane.[8]

---

[4]  https://news.lockheedmartin.com/2018-06-06-Lockheed-Martin-Built-F-35-Comes-Home-to-RAF-Marham  (last accessed June 6, 2020).
[5] *See, e.g.,* Dickstein, Corey, "F-35B Lightning II fighter jet crashes, pilot ejects in South Carolina," Stars & Stripes, Sept. 28, 2018, https://www.stripes.com/news/us/f-35b-lightning-ii-fighter-jet-crashes-pilot-ejects-in-south-carolina-1.549535 (last accessed June 6, 2020); Macias, Amanda, "America's most expensive weapons system just got a little cheaper," CNBC, Sept. 28, 2018, https://www.cnbc.com/2018/09/28/f-35-fighter-jets-americas-most-expensive-weapons-system-just-got-a-little-cheaper.html (last accessed June 6, 2020).
[6]  Sept. 28, 2018 press release, F-35 Lightning II Joint Strike Fighter Program Office of Public Affairs, http://www.jsf.mil/news/docs/20180927_LRIP_11_Press_Release_v2.pdf (last accessed June 6, 2020). One report noted that, as of 2014, the program was "$163 billion over budget, seven years behind schedule, and will [through 2020] cost taxpayers about twice as much as sending a man to the moon." Drusch, Andrea, "Fighter plane cost overruns detailed," *Politico*, Feb. 16, 2014, https://www.politico.com/story/2014/02/f-35-fighter-plane-costs-103579 (last accessed June 6, 2020).
[7] *See* https://prattwhitney.com/products-and-services/products/military-engines/f135 (last accessed June 5, 2020). Pratt & Whitney is a division of Raytheon Technologies Corporation. *Id.*
[8] https://en.wikipedia.org/wiki/Pratt_%26_Whitney_F135 (last accessed June 6, 2020) (citing Katz, "The Physics and Techniques of Infrared Stealth," *Aviation Week*, July 7, 2017).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)



*Figure 1: F-35 B and C variants in flight, showing engine exhaust nozzles*[9]

29.    Selmet manufactures the flaps for the exhaust nozzle. Pratt & Whitney purchases these flaps from Selmet, using funds received from the Government – specifically, from the DOD.

30.    Selmet makes parts for many customers in addition to Pratt & Whitney, and some of those parts are also used in military aircraft. These other customers include Numet Machining Techniques, Inc.; Soldream, Inc.; Bell Helicopter Textron Inc.; L3Harris; and TATA Sikorsky Aerospace Limited, to name a few. Relators estimate that 30 - 40% of the parts manufactured by Selmet are used in military aircraft.

**B.    Liquid-Penetrant Testing and Visual/Dimensional Inspection**

31.    Defendant Selmet produces cast titanium parts for the aerospace industry.

32.    The exhaust nozzle parts and other cast titanium parts produced by Selmet undergo many sizing, shaping, curing and inspection steps before they are shipped to customers for eventual

---

[9] *Available at* https://www.f35.com/media/photos (last accessed June 6, 2020).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

installation in F-35s and other military and civilian aircraft. At various points in the production process a given part may be welded, ground, heat-treated, and subjected to a chemical bath, all in order to ensure that the part will fit and function properly when installed.

33.     Selmet supervisors typically encourage or even require line employees to cut corners and skip some of these steps, or perform them in a slipshod manner, in order to meet production quotas and deadlines. Two of the processes that most frequently fall victim to this corner-cutting mindset are liquid-penetrant testing and visual/dimensional inspection.

34.     Liquid-penetrant testing is a non-destructive inspection method used to detect casting, forging and welding defects.[10] It is a standard process in the precision casting industry, and is required under the subcontracts through which Selmet receives Government monies, including its subcontract with Pratt & Whitney for parts for the F-35 exhaust nozzle.

35.     Visual inspection looks, not only with the unassisted eye but also by x-ray, for any defects in a part. Dimensional inspection involves multiple precise measurements of a part to make sure it is within specified tolerances. As many as 200 measurements must be checked on some parts.

36.     Visual/dimensional inspection is a key part of the production process, and is required under the subcontracts through which Selmet receives Government monies, including its subcontract with Pratt & Whitney for parts for the F-35 exhaust nozzle.

---

[10] *See, e.g.,* https://en.wikipedia.org/wiki/Dye_penetrant_inspection (last accessed June 6, 2020) (explaining that the process involves the application of (typically) a brightly colored fluid to a part; allowing time for the fluid to soak into cracks, pits, etc.; removal of excess penetrant from the surface of the part; and application of a compatible developer, which draws the penetrant out of the flaws by capillary action and reveals them as visual indications on the part). Liquid-penetrant testing is one of the most commonly used techniques for Non-Destructive Testing ("NDT"), the general term for a range of methods used to evaluate the properties of materials, components or systems without causing damage to the item being tested.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

37.    Flaws found in a part can be welded or ground, as required, until the part is structurally sound and properly sized to perform its function. If a flaw is too fundamental to fix in these ways, the part must be scrapped.

38.    During Relators' tenures, the workplace culture at Selmet valued "throughput" above all other metrics. Consequently, supervisors typically encouraged or even required line employees to ignore flaws – or inadequate attempts to fix flaws – in order to meet production quotas and deadlines, especially at the end of the month. The supervisors falsified documents or required workers to falsify documents showing that work, including liquid-penetrant testing and visual/dimensional inspection, had been performed when it had not, and that parts were ready to ship when they were not.

39.    Defendant invoiced Pratt & Whitney and other customers for these parts, and these invoices were false and fraudulent in that they misrepresented that the parts had been properly finished and inspected, and were serviceable and fit for their intended use.

40.    Many parts, including many exhaust nozzle parts for the F-35 and other parts for other military aircraft, were returned to Selmet as unserviceable by Pratt & Whitney and other Government contractors. These parts were kept in Selmet's warehouse. Often, instead of scrapping these rejected parts, the company would "sneak" them, piecemeal, back into the production line with paperwork that did not indicate that they had been previously rejected by the customer.

41.    When Relator LaPlant visited the Selmet warehouse in approximately December 2018, the warehouse was filled with such returned and rejected parts. Even so, Relators believe that many substandard parts shipped by Selmet, were not "caught" by the end users and were instead installed in aircraft, including the F-35 and other military aircraft.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

42.    Defendant's false and fraudulent invoices for F-35 exhaust nozzle parts, and for other parts intended for military aircraft, were paid by Pratt & Whitney and other contractors using Government monies. These invoices were therefore false claims for purposes of the FCA, 31 U.S.C. §§ 3729 *et seq.*

43.    When Relators were terminated in July and October of 2019, respectively, the workplace culture that promoted and protected this fraud was still prevalent at Selmet. On information and belief, that culture is still prevalent as of the filing of this Complaint.

44.    The fraud described herein was and is committed with the full knowledge of, or under the willfully and intentionally blind eyes of, Selmet management.

C.    **Defendant's fraud**

1.    **Failure to properly conduct liquid-penetrant testing**

45.    Selmet's most prevalent and egregious fraud is its failure to properly conduct liquid-penetrant testing on the parts that it casts. In many instances, the testing is not done effectively; in others, it is not done at every appropriate point in the overall manufacturing process.

46.    In an effort to cut corners and speed production, in many instances developer is not used in conjunction with penetrant, rendering the process ineffective at revealing cracks, pits, bubbles and other flaws.

47.    Parts to which welds have been added (e.g., to repair cracks, build out missing areas, or fill hollows) are frequently not subjected to penetrant testing after welding.

48.    A part undergoing final penetrant testing must be inspected within four hours of the application of penetrant; if this is not done, the part must be cleaned and penetrant re-applied. However, Defendant regularly ships parts without performing this step.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

49.     The invoices that Selmet submits to its prime contractors are false and fraudulent, because the liquid-penetrant testing required under Selmet's subcontracts was either not done properly, or was not done at all. The invoices paid with Government monies are false and fraudulent for purposes of the FCA.

50.     Relator LaPlant frequently raised concerns about Selmet's failure to properly conduct penetrant testing, including to his immediate manager, Production Supervisor Brandon Rutter. In one such instance on or about March 27, 2019, Rutter told LaPlant that he (LaPlant) was confusing the workers on swing shift by insisting that they follow proper process. Rutter said words to the effect that LaPlant was "worrying about things that were not part of his job." Relator LaPlant then responded that he would not cut corners, and specifically that he would continue to insist that penetrant testing be performed on any areas of parts that had been reworked after heat treatment. LaPlant remembers that Rutter was visibly upset by this response.

**2.      Visual/Dimensional Inspection records are falsified**

51.     In Relator Cardwell's experience, supervisors frequently override the recommendations of their "vis/dim" inspectors, and certify uninspected and in some cases defective parts for shipment.

52.     Every individual part that is shipped by Selmet must undergo a final visual/dimensional inspection. However, Selmet supervisors frequently certify parts for shipment before such a final inspection has been conducted.

53.     These fraudulent certifications happen most frequently at the end of the month, when supervisors are trying to meet production targets.

54.     Relator Cardwell is aware of numerous instances of supervisors overriding his rejections of parts, and falsifying paperwork so as to be able to ship those parts. In some instances,

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

Cardwell's employee number was used on the paperwork, making it appear that he had inspected the parts and cleared them for shipment. *See* ¶¶ 69-72 and Figure 2, *infra*.

55.     On one occasion Relator Cardwell confronted Salvage Analyst Oscar Santos about such an override. When thus confronted, Santos fished Cardwell's original paperwork out of a trashcan, right in front of him and Andy Glover, an engineer who happened also to be present. Cardwell does not know however what ultimately happened with the parts involved.

**3.     Other ways in which Selmet improperly cuts corners**

56.     Penetrant inspectors will sometimes weld or "blend" on a part when they find an indication of a crack or other flaw, but will fail to take a measurement before or after such "blending," leaving some parts with uncorrected surface unevenness.

57.     On or about February 15, 2019, Relator LaPlant confronted two penetrant inspectors to ask whether they took the required before and after measurements. Both said no, and in fact one even admitted that he did not know how to properly use the measuring equipment. LaPlant took his concerns to Dalton Svenson, Selmet's Level III NDT technician,[11] who told LaPlant words to the effect that he was aware that processes were not being followed correctly, but that he had to "pick his battles."

58.     Moreover, workers and supervisors frequently do not bother to create or maintain the required paper trail for welding work.

59.     Other essential and required steps are frequently skipped. For instance, parts are frequently sent back for welding without being properly cleaned first, and re-worked parts are often not given a final heat treatment, as required.

---

[11] *See* n. 10, *supra*. A Level III NDT technician is certified to develop, qualify and approve procedures, establish techniques, interpret codes and standards, and train others in their use. Svenson was the highest-ranking NDT technician at Selmet.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

60.    All the failures described herein result in Selmet's customers – including the Government, the ultimate customer on the F-35 parts – receiving less than what they paid for. This fraud was and is committed with the full knowledge of, or under the willfully and intentionally blind eyes of, Selmet management.

**D.    Defendant's retaliation against Relators**

**1.    Retaliation against Relator LaPlant**

61.    Relator LaPlant spoke up on numerous occasions about the incidents and practices described herein, putting the company on notice of his belief that Selmet was committing fraud upon the Government.

62.    LaPlant was outspoken about these problems from very early in his tenure at Selmet. For instance, approximately a month after he was hired he complained to supervisors Dan Moore and Scott Reese, saying in effect that the proper manufacturing and inspection processes were "there for a reason," but that they were not being followed. In particular LaPlant insisted that Selmet needed to create and maintain proper documentation of everything that was done to each part – something that the company was not doing. Moore and Reese told him, in effect, to "look the other way."

63.    LaPlant continued to complain about the problems and failures he saw, at times on an almost-daily basis. Every worker and supervisor to whom LaPlant complained knew or had reason to know that parts for the F-35 and other military aircraft were among the parts that LaPlant was complaining about, and that therefore LaPlant's complaints amounted to allegations that Selmet was committing fraud upon the Government, the ultimate payer and customer for those parts. LaPlant persisted in trying to reform Selmet's culture and thereby stop the fraud, but he was

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

met by indifference about remedying the situation and hostility for raising the concerns, *see, e.g.,* ¶ 50, *supra.*

64.    In a meeting approximately three months before his eventual termination, LaPlant asked Production Supervisor Rutter point-blank whether Selmet would reform its procedures and processes. LaPlant noted that the company's failure to follow correct procedures meant that their customers were not getting what they paid for, and he specifically mentioned Pratt & Whitney, Selmet's prime contractor for the F-35 engine parts. This put Rutter, his supervisor, on notice that LaPlant was alleging fraud upon the Government, and that he was trying to put a stop to it. Rutter did not respond to LaPlant's questions or comments.

65.    Approximately a month before his eventual termination, LaPlant told Amy Schurmire,[12] the plant's then-new Quality Manager, about the frequent failure to perform liquid-penetrant testing at all appropriate stages, and the failure to perform heat treatments. As Quality Manager, Schurmire knew or had reason to know that, with regard to F-35 and other military parts produced by Selmet, LaPlant's allegations amounted to claims of fraud upon the Government. To LaPlant's knowledge, the Quality Manager reported his complaints up her chain of command, but nothing was done.

66.    At some point closer to his eventual termination, LaPlant confronted Salvage Analyst Travis Eubanks and required him to conduct and document the required inspections, and to properly route the accompanying paperwork. This led to a conversation in the company parking lot between LaPlant and Rutter, who told LaPlant words to the effect that he needed to do things "the Selmet way," which LaPlant understood to mean prioritizing throughput over thoroughness and safety.

---

[12] Phonetic spelling.

67.    On or about July 31, 2019, Rutter called LaPlant into his office, where they met with Colin Downey, another supervisor. The supervisors told LaPlant that he was being terminated for not responding promptly to work emails. This was a pretext; LaPlant was actually terminated in retaliation for his lawful efforts to stop Selmet from committing the fraud described herein.

### 2.    Retaliation against Relator Cardwell

68.    Almost as soon as he came back to Selmet in approximately March of 2019, Relator Cardwell became aware that the company's supervisors were encouraging and in some instances requiring line workers to cut corners, in order to meet production targets. As alleged *supra*, Relator Cardwell's own recommendations were intentionally overridden and ignored by his supervisors on more than one occasion.

69.    Relator Cardwell raised concerns about these practices and policies, putting the company on notice of his belief that Selmet was committing fraud upon the Government. He would frequently say things like "Imagine a pilot going in to drop bombs – and his thrusters go out because we didn't do our work properly." With comments like these, which he made in the presence of co-workers and supervisors, Cardwell put Selmet on notice that (a) he was aware – as were virtually all Selmet workers – that a substantial number of the parts they worked on were destined for military aircraft, for which Selmet would of course be paid by a Government contractor, and that (b) he was aware – as were virtually all Selmet workers – that management policies were allowing and even encouraging work that was so substandard as to amount to fraud upon the Government.

70.    Cardwell's efforts to raise alarms about and stop the fraudulent practices were met with demeaning comments and mockery.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

71.     On July 15, 2019, Cardwell wrote the following email to supervisors Tristan Propst,

Dan Moore, and Taylor Plagmann:



From: Steve Cardwell
Sent: Monday, July 15, 2019 1:46 AM
To: Tristan Propst <tristanp@selmetinc.com>; Dan Moore <danm@selmetinc.com>; Taylor Plagmann <taylorp@selmetinc.com>
Subject: Using someonel elses stamp or employee number

        It has been brought to my attention after over three months of employment here that there is no need for side-stamping nor writing your employee number on any main or SR router if unable to finish due to numerous reasons. I have been told only to look over the previous employees work and except it or make any changes necessary in order to move the part forward. There are far to many reasons to list why partialing any worked part is beneficial, i have always believed, therefor I have partialed every part here at Selmet i was unable to finish until last week. after multipal conversations from every seasoned employee in the dimensional dept telling me theirs no reason to i stopped and followed suit. Yet someone from this dept used my employee number without consent to sidestamp a main router(1142-lot 933)2nd final dim....

*Figure 2: Cardwell email*

72.     In the email Cardwell complains that another inspector or supervisor used his

(Cardwell's) employee number fraudulently to indicate Cardwell had inspected certain parts when

he had not. Cardwell received no response to this email.

73.     Approximately two weeks after he sent the email in Figure 2, at a group meeting of

both day and swing shifts, Cardwell raised the problem of the fraudulent use of others' employee

numbers. Supervisor Propst berated him loudly in front of the whole group, then pulled him aside.

Cardwell mentioned that he had sent Propst the email, but Propst denied ever receiving it.

74.     Propst and everyone else who was present at the group meeting understood that the

conduct that Cardwell was alleging constituted fraud and would result in Selmet obtaining

Government monies to which it was not entitled.

75.     In approximately October of 2019, Cardwell was given the choice of stepping down

to the position of Grinder (if he wanted to stay on the evening shift), or moving to the day shift (if

he wanted to remain a Vis/Dim Inspector) where he would work under two supervisors who had already demeaned and mocked him.

76.    This choice between two intolerable alternatives amounted to constructive discharge by Selmet, in retaliation for Cardwell's efforts to stop Selmet from committing the fraud described herein.

## VII.
## COUNT ONE
## PRESENTATION OF FALSE CLAIMS
## 31 U.S.C. § 3729(a)(l)(A)
## *(on behalf of the United States)*

77.    Relators repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

78.    During all times relevant herein, Defendant was a recipient of monies from the United States within the meaning of 31 U.S.C. § 3729(b)(2)(A)(ii). These monies were and are to be spent to advance the United States' interests in properly equipping its armed forces.

79.    As described *supra*, Defendant knowingly caused to be presented to contractors of the United States false or fraudulent claims for payment or approval for work done under its subcontracts. The claims were false or fraudulent because in making those claims, Defendant represented that it was performing as required under the subcontracts and applicable laws and regulations, and that it was providing parts that were serviceable and fit for their intended purposes, when Defendant knew that this was not the case.

80.    The knowing submission of these false claims by Defendant caused the Government to pay out monies that it would not have paid if it had known of the falsity of the claims.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

81.    Accordingly, Defendant violated § 3729(a)(l)(A) of the FCA, and each false or fraudulent claim submitted is a separate violation of the FCA.

82.    By reason of the false or fraudulent claims that Defendant presented or caused to be presented, the United States suffered damages in an amount to be determined at trial, and is entitled to treble the amount of those damages under the FCA, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the United States and Relators.

## VIII.
## COUNT TWO
## MAKING OR USING FALSE RECORD OR STATEMENT
### 31 U.S.C. § 3729(a)(l)(B)
#### (on behalf of the United States)

83.    Relators repeat and re-allege each and every allegation set forth above with the same force and effect as if fully set forth herein.

84.    As described *supra*, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment under its subcontracts.

85.    The making and use of these false records or statements caused the Government to pay out monies that it would not have paid if it had known of the falsity of Defendant's records and statements.

86.    Accordingly, Defendant knowingly made and used false records or statements material to false or fraudulent claims for payment, in violation of § 3729(a)(l)(B) of the FCA, and each such making or use of a false record or statement is a separate violation of the FCA.

87.    By reason of the false or fraudulent records and statements that Defendant made or used, or caused to be made or used, the United States suffered damages in an amount to be

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

determined at trial, and is entitled to treble the amount of those damages under the FCA, plus civil penalties of not less than $11,181 and up to $22,363 for each violation and the reasonable attorney fees and expenses incurred by the United States and Relator.

### IX.
### COUNT THREE: RETALIATION
### 31 U.S.C. § 3730(h)
### *(by Relator John LaPlant individually)*

88.    Relator LaPlant repeats and re-alleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

89.    Defendant intentionally retaliated against LaPlant by discharging him without valid reasons, and by harming his professional and career advancement and potential employment opportunities.

90.    Defendant retaliated against LaPlant because of his efforts to stop Defendant's fraud, and Defendant had actual knowledge of such efforts.

91.    Defendant's retaliation has damaged LaPlant, including but not limited to personal hardship and economic loss, in a substantial amount to be determined at trial.

92.    LaPlant therefore respectfully requests an order awarding him the maximum amount of damages available under 31 U.S.C. § 3730(h)(2), including reinstatement, two times backpay, interest, special damages, and attorney fees.

### X.
### COUNT FOUR: RETALIATION
### 31 U.S.C. § 3730(h)
### *(by Relator Stephen Cardwell individually)*

93.    Relator Cardwell repeats and re-alleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

94.     Defendant intentionally retaliated against Cardwell by marginalizing and constructively discharging him without valid reasons, and by harming his professional and career advancement and potential employment opportunities.

95.     Defendant retaliated against Cardwell because of his efforts to stop Defendant's fraud, and Defendant had actual knowledge of such efforts.

96.     Defendant's retaliation has damaged Cardwell, including but not limited to personal hardship and economic loss, in a substantial amount to be determined at trial.

97.     Cardwell therefore respectfully requests an order awarding him the maximum amount of damages available under 31 U.S.C. § 3730(h)(2), including reinstatement, two times backpay, interest, special damages, and attorney fees.

## XI.
## PRAYER FOR RELIEF

**WHEREFORE**, Relators respectfully request that this Court enter judgment in their favor and that of the United States, and against Defendant, granting the following relief:

(A)     an Order instructing Defendant (1) to cease and desist from the fraudulent conduct described herein, and (2) to assist the Government, its contractors, and agents in locating and removing any faulty parts that were installed in military aircraft because of its conduct, and (3) to replace those parts with serviceable parts, at Defendant's own expense;

(B)     an award to the United States for treble its damages, a civil penalty for each violation of the FCA, and its costs pursuant to 31 U.S.C. § 3729(a)(3);

(C)     an award to Relators in the maximum amount permitted under 31 U.S.C. § 3730(d), and for the reasonable attorney's fees and costs they incurred in prosecuting this action;

(D)     an award to Relator LaPlant of reinstatement, two times backpay, interest, and special damages under 31 U.S.C. § 3730(h)(2);

(E)     an award to Relator Cardwell of reinstatement, two times backpay, interest, and special damages under 31 U.S.C. § 3730(h)(2);

(F)     awards to the United States and Relators of pre- and post-judgment interest at the rates permitted by law; and

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

(G)    an award of such other and further relief as this Court may deem to be just and proper.

## XII.
## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relators demand trial by jury on all questions of fact raised by the Complaint.

Dated: June 12, 2020                    Respectfully submitted,

**CRISPIN MARTON CAMBRELENG**
**Local Counsel**

*/s/ Rebecca Cambreleng*
Rebecca Cambreleng (133209)
1834 SW 58th Avenue, Suite 200
Portland, OR 97221
(503) 293-5770 (office)
*rebecca@employmentlaw-nw.com*


**BROWN, LLC**
**Lead Counsel**

*/s/ Patrick S. Almonrode*
Patrick Almonrode
Benjamin Lin
Jason T. Brown
    *pro hac vice applications forthcoming*
111 Town Square Place, Suite 400
Jersey City, NJ 07310
(877) 561-0000 (office)
(855) 582-5297 (fax)
*patalmonrode@jtblawgroup.com*
*ben.lin@jtblawgroup.com*
*jtb@jtblawgroup.com*


*Attorneys for Relators*
*John LaPlant and Stephen Cardwell*

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2020, I caused a true copy of the Complaint in the matter captioned *United States of America ex rels. LaPlant & Cardwell v. Selmet, Inc.* to be served upon the following, along with written disclosure of substantially all material evidence and information possessed by Relators:

Billy J. Williams, United States Attorney
United States Attorney's Office
　District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204

Office of the Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
*Civilfrauds.quitams@usdoj.gov*

*/s/ Patrick S. Almonrode*
Patrick S. Almonrode